The next case on the calendar is Scienton Technologies v. Computer Associates. May it please the Court, good morning. My name is Rob McGill. I represent your appellants in this matter, and with me today is Mr. Frederick Zivig. Scienton was the proper plaintiff below. Scienton specifically had standing, at a minimum and as acknowledged on briefs by both parties, to assert a contract claim under a transfer agreement that existed as of 2000, documented in the year 2004. So at the outset of this case that is now, I think, 13 years old, your plaintiff, Scienton, came to court with certainly contract rights. So it had, for Article III purposes, standing to be in the court. So what happened, and this Court is well aware of this. Well, there were more than one plaintiff at the time, right? Yes, sir. The other two, and even under your scenario, or under the other side's scenario, PI Group, is that the right one? NI Group. NI Group, rather, had standing. Under their reading of it, the claims were never transferred. So there was definitely standing when the suit began on the part of one or more plaintiffs. I'm sorry, I didn't hear the last part. On the part of one or more plaintiffs, there was standing. There was. At the time. Yes, sir, I'm sorry I didn't hear you when you said that. But if I may answer, or not answer but direct to the Court, to one very important procedural standpoint, as a trial lawyer for more than 30 years and as a court, district court or otherwise, I will tell you that Rule 50, Rule 50A and Rule 50B are of critical importance to the trial lawyer and to the trial judge. 50A says that if you have, like in this case, a real party and interest argument, you had best raise it. There was no 50A motion associated with a real party and interest. It was directed solely, to repeat solely, to whether secure IT could be in the case. With respect to the three-day later letter motion that was filed under 50 or 50B, as the case may be, there was nothing other than a standing argument. There was no real party. Was that letter filed before the jury got the case? It was. So that's still A, right? It's 50A. Agreed. Okay. Okay. That's the way I would look at it. I think there was some argument back and forth. But in any event, with respect to what was said to the district judge in that letter motion, what was said is there was a standing problem. There was not, at any time in the Rule 50 context, a real party and interest argument. So for that reason, for that procedural reason, that real party and interest argument from a jurisdictional standpoint, we would say, from our side of the courtroom, has been waived. With respect to the ---- Could you explain why you regard this as a real party and interest problem as opposed to a standing problem? Yes. I mean, I think that with respect to the real party and interest, the question is solely whether or not there was a transfer of tort claims at the time of the assignment between N.I. Group that went to Scienton. With respect to the contract rights, by virtue, and this is page 270, by the plain terms of this, it assigned all contacts, all contracts, and other relationships. That's what the document said. What was raised, by virtue of the arguments that were had below, was whether or not there was a real party and interest in the sense, could Scienton assert tort claims under the terms of that agreement? And what we had is uncontroverted evidence from both sides of the agreement. From the N.I. Group agreement, from the N.I. Group side, Jovan Milidovic said, I intended to assign everything that I had, and we've cited that on brief. So that raises the question about whether the parties can do something, notwithstanding the fact that the most reasonable interpretation might be that the tort claims were not transferred because contracts and contacts and clients were transferred, but not the idea, not the claim based on the idea, not specified in the agreement. And I've thought about that. I mean, if you end up with an agreement that doesn't cover everything, can the parties still, by virtue of oral understandings, convey something in addition to that? I don't know. Well, and I think the testimony from both sides of that transaction, from Mr. Zivic on his side and Mr. Milidovic from his side, Scienton and N.I. Group, they said, yes, we did have such an intention, and both parties so testified. We would submit respectfully. I may be just misunderstanding the record, or you can help me understand it better, but is it clear that the tort would even have happened yet as of November 2000? So as I read the testimony, there's a transfer looking at this evidence of contracts, contacts, and then there's a development of the product by Scienton and testimony from both principals that Scienton is developing the product, and then the relationship is terminated. Could the misappropriation have occurred, at least in part, while Scienton is working on the contract? Two responses. One, I don't believe that the misappropriation, per se, had taken place at that time, but the latter part of it. What do you mean by at that time? At the time of 2000, at the time of the communication between the parties, that they would transfer all assets from one entity to Scienton, I don't believe the appropriation. But the document was four years later, right? Yes, sir. And why did the document necessarily relate back to 2000? It could have been drafted at that point to cover what happened in the meantime. At that point, you knew that there were claims. I think that it did when the language itself said that there was a transfer of all contacts, contracts, clients, and all future revenues and profits arising from said contracts, et cetera. That's the position you took, and that's why you picked Scienton to be the plaintiff when that option was presented. But the district court ruled to the contrary. You were alerted to the fact that this was at least a questionable position. There was a challenge to it. And it seems to be odd that you didn't take any measures to try and correct this. That's why we named both parties. And we named all parties, and there was never an issue. And you ended up submitting Scienton as the sole plaintiff to the jury. We said specifically that the court could, based on the testimony at the trial and this particular exhibit, the court could specifically find as a matter of law, and that's what we requested, that Scienton was the proper plaintiff. You didn't get that finding. You got the finding after the jury returned its verdict against you. Well, and I think what the court said was, I mean, we can all read the transcript, but what the court indicated and said was that she was picking Scienton as the plaintiff, and if she were reversed on appeal, so be it. But in any event, and finally we ---- She wasn't picking it. You were picking it. That was the problem. And the court made clear that it was a questioned and questionable decision. The court didn't make a ruling as to who the proper plaintiff was. I think that's pretty clear from the record. May I ask, would it have been permissible to take the position that the jury should just be asked, did the defendant steal the intellectual property of the plaintiffs? Could have been, yes. And in that case, a verdict would ---- would a judgment enter in favor of both plaintiffs, and then if NI group decided that they wanted half of it or all of it or something, it would be between the two plaintiffs to worry about how the money got divided. Could have been, yes. That could have been the case. And what we, with respect to the ---- Wouldn't that have been the safest thing from the plaintiffs, assuming that would be permissible, wouldn't that have been the safest thing for the plaintiffs to do at that point, to say, look, on our side of the V, if you're, according to the testimony of the proprietor of NI group, there isn't any real problem. So let's just put it as, did the defendants do us wrong? And then we'll whack up the money between us after the judgment is paid, if there ever is a judgment. Would that have been anything wrong with that? Nothing. And that's why we pled the case as we did. Yeah. And that's why ---- And did the district court tell you, you can't do that? You have to pick a plaintiff, one or the other, not both? The district court decided that she was going to pick Sianton, and that was her decision. You know, I don't see that in the record, frankly. But we ---- Where is it in the record that the district court says, you have to go with one plaintiff, not two? She didn't say that precisely. She said that, and I've made reference to that point in the record in terms of her decision. But if I may turn to one final point that we want to present to this court, with respect to what happened below and the evidentiary ruling associated with the patent, I can say from the Sianton standpoint that we had on our damage case two things that were critical for us to show. Number one, we had to show the amount of losses associated with this software misappropriation on an annual basis. And then critically, and I would submit to the court respectfully, most important, by far the most important thing that we had to submit was a damage period. And with respect to the damage period that we submitted, we submitted a 10-year damage period and showed on one software alone $60 million worth of damages. Because the patent evidence was liminated and not allowed, our expert could not affirmatively support his 10-year damage period by virtue of the patent that had been submitted. What testimony was offered with respect to the patents? What was it that was excluded? Any reference to the patent at all was excluded. But what was proposed, though, to be, I found myself unclear about this, so when I suggest an interpretation, I don't mean to suggest that I think that's really right, just I got the impression that what was offered was we just want to put the patents into evidence with no expert testimony as to what they mean, what they're for, why they're good, what matters about them. Is that wrong? There's one addition to what you just said, and it's an important one. We had indicated that the patent evidence should be submitted at a minimum for purposes of establishing our damage period. I understand. The legal purposes is one thing. What was the jury going to see if you had your way that they didn't get to see? Am I correct that the answer is there would be a bunch of patents that would be put into evidence and put before the jury, or is there going to be some further explanation of their significance as part of the evidentiary record that's being provided? There was going to be a specific explanation at docket 409. We had abstracted each of the nine ideas that were misappropriated and found to have been misappropriated, and there was a comparison in that docket, that docket entry between the nine ideas and the plain, unambiguous terms of the patents themselves. You could compare the ideas and see the exact patent language and make that comparison. It did not turn it into a patent case. Docket 409 shows specifically that comparison that we wanted our experts . . . And what exactly is docket 409? That's an exhibit, that's a declaration, that's an expert report. What is that? It's a submission that we made to the court of what the testimony would be and the comparison that would be between, Your Honor . . . And who was going to give that testimony? Dr. Rao was going to testify specifically that with respect to each of these nine ideas, there were going to be two forms of testimony. One, the affirmative support on the damage period, critically, number one. Number two, it was also going to show that these nine ideas were also utilized in the integrated products. And therefore, with respect to the integrated products that he was not allowed to testify at all about, that each of those nine ideas were embedded in the integrated products. Where is that going to come from, the patents? These are patents for the integrated products? I was confused about this, too. Did he even need the patent testimony to make the argument, the claim about the integrated products? Or are they two separate things? They are two separate things in the sense that in terms of what Dr. Rao could have testified to had he been allowed, he would have shown specifically that with respect to each of these integrated products, they included the nine different ideas and at page 50 and 51 of our brief in docket 472, we've laid all of that out specifically. Now you're not talking about patents, right? No, sir. We're talking about technologies that are embedded in the integrated products and how those technologies compare to the nine ideas found to be misappropriated. Why isn't all of this related to liability? And why didn't it come in in the liability phase, including the patents and the nine products? So the judge made her determination, and she made it clear to us that it was not going to be a patent case. And, Your Honor, if I may say, with respect to our burden of proof on novelty, the district judge believed that we were going to have to prove that a different way, and we did. So with respect to the ruling of the court, we're not here today to talk about that issue. We're here today to talk about what happened to us in terms of our damage evidence. We were not able to support or respond to the two-year damage period of Computer Associates. The headline of their exhibit on these damages, it's with A271, two-year head start. So with respect to why we're here today. Are you talking about contract or tort damages here? We're talking about the tort damages with respect to the verdict that was given. Not the contract damages. No, and we've assigned error or attempted to assign error on the contract damages. But wouldn't there, in order to establish that this ten-year damage period, it would be necessary to determine whether those patents were valid, wouldn't it? Well, no, I don't think so, because the patent has been, the patent existed during the period of time that was the run-up to the case. And these are their patents, is that right? Yes. So they're not in a position to come in and say they're invalid. That's right, this case was tried two years after the damage period expired. The damage period that we submitted in exhibit, or page 269, was from 2004 to 2013. So when we came to court, we asked the jury to look at that damage period. We said ten years. They said no, two years, and we were not able to explain that they had patent protection during that entire time. So this ruling associated with the damages was a shield and a sword for computer associates. And it left us, frankly, in a situation where the direct examination of Dr. Rao was materially limited, and we were materially prejudiced in that we could not defend the core element of our whole lawsuit on damages, which is a ten-year damage period. And then think about this. In final argument, we see two-year Head Start being the banner of their, the headline of their argument. There was no ability for me at that time to say a word about the patent protection they'd had for years. So we were in a situation on the damage case alone, with respect to this patent ruling, where we couldn't support our claim properly, and we couldn't defend against the two-year damage period. So with respect to the verdict, the special interrogatories, which are extremely detailed here, the court laid out exactly what the jury had to decide, and was precise in what she did. And you can take a look at this and see, with respect to a remand, the liability issues associated with the tort have been fully and finally resolved. We're now in a situation of just now, almost 13 years into this, a two-day damage trial from getting to the point of a proper damage presentation, where we have the opportunity to defend our damage period. If you have standing. I'm sorry? If you have standing. If we have standing. Now, here's my question on standing again. Yes, sir. Section 17A.3 says that there's got to be a period of time left afterwards, a reasonable period of time in which the person can try and remedy the problem that's associated with not having the proper party in interest. She took the position at trial that you had plenty of time because you were on notice right from the beginning of this case, of the trial, right up through the Rule 50A and so forth, of the arguments that were being made by the other side. And what's your response to that? They never, at any time in the record that shows this, raised the real party in interest argument. They never did. Back to your question of standing. Yeah, but in any event, I would have thought you might have said that I didn't know what the outcome would be. I didn't know we were deprived or we weren't a real party in interest or didn't have standing until she ruled. And under those circumstances, we needed more time to try and resolve this problem, and maybe it could have been done afterwards. In other words, you were not on notice of the outcome. You were on notice of an issue, but not the outcome. Agreed. And the challenge here for us was, of course, we were in the courtroom when the testimony was given by Mr. Zivick and by Mr. Milodovic, and they each said what they said. We had the agreement, as you've seen, and with respect to what we— The other side offered because it tended to favor their side, frankly. Of course. Now, if I may, just one more point on your standing question. When they came back with their letter motion three days after their initial Rule 50 motion, it, again, was the matter of standing. With respect, they said they couldn't ascertain which party had standing. To us, we look at this then as we look at it today. Standing, did Sciontown at a minimum have standing to bring a contract claim? Of course it did, and this issue was otherwise percolating, but standing was not the question then. It isn't the question today as we submit. So for that reason, we came to this, and the Court made the judgments that it did. But where we stand today is we have one further problem. The Court dismissed interjudgment on the contract claim, and with respect to that judgment— Before we get to that one, I want to go back to the patent issue because I don't think you've addressed at all what the district court actually ruled as I understand it. So tell me if I'm right about this. A year before the trial, essentially, January 2015, the district court concludes that the patent analysis in the damages report of your expert is a new and complex analysis and opinion regarding liability that had not been the subject of the previous liability report, and then the district court says this is after the close of patent and liability expert discovery. This raises a myriad of factual issues not previously addressed, including the history of the patent applications, whether they actually covered certain products, and expert discovery on liability has been closed for two and a half years. And therefore, she says, I'm not going to allow this to go forward. Tell me why that's an abuse of discretion. Well, I remember those words as if they were spoken yesterday, and what that told us specifically, Your Honor, is this. What that told us is that with respect to patent and the issue of liability, it was not going to be allowed, and that when we got to the point of proving novelty, we were not going to be allowed to submit the very patent application. That's the first part of the answer. The second part is with respect to the separate and distinct issue of damages, we understood the ruling, what the district judge had told us, specifically in the words you just read about liability. That did not answer the issue about the tort liability associated with the misappropriation of an idea, and a patent gave computer associates a protection in the marketplace that we had the right to submit to a jury. I'm not saying that we necessarily would have won. I'm saying that we should have had the right on the most important element of our damages to submit the patent and let the jury decide. But what was in issue was something called the Myers Damage Report, right? Yes. In 2015. That's what she's talking about, and she's saying we can't have this because this is introducing new issues into the case. As we read it on the issue of liability, and then she indicated further that with respect to the case that would proceed, portions of his opinion would be allowed, and he was allowed to testify his abstraction of the nine ideas that were misappropriated, and he did so testify, which brings us to that docket 409 and the comparison between the nine ideas, Your Honor, specifically, and what happened with those nine ideas in terms of the products, how they used them in the two softwares we're talking about and the integrated products. So that ruling that you have just read to us was a manifest for what we were going to be allowed to prove or not prove in the lawsuit. So you're saying that in October of 2015, the judge misconstrued her own prior ruling? Well, yeah. I mean, misconstrued would be a little harsh from my standpoint. I think that she's the judge, and she gets to make decisions as she goes, and she gets to make judgments as the case unfolds. So the October 2015 ruling is wrong. Why exactly in light of the January ruling? Well, there were two features of it that were wrong. The first one I've just covered, if I may add the second. She also ruled that Dr. Rao could not testify as to certain aspects of his conclusions and indicated that he was impermissibly relying on the report of Dr. Myers that was dealt with by the very language you just quoted to us. But what we have said is specifically that Dr. Rao had a long list of data and information that he utilized for his opinion. Mr. Zivick's testimony, Dr. Weiss's testimony, Dr. Cohen's affidavit, the software agreement, et cetera, et cetera. All of which we laid out in our brief on pages 50 and 51. This is what was an error with respect to her conclusion in our judgment, respectfully, as to not allowing Dr. Rao to testify as to those integrated products. Oh, that's a separate – the integrated products is a separate story. I'm still focused on the patents. Okay. So your argument is that the existence of the patents is relevant to damages independently of any claim that you might have had for somehow under patent law. Is that the nub of it? That's the nub of it, and she so concluded, and we have – that ruling went forward. That's how the lawsuit was tried. She made it clear on that issue that not only would we not have a patent case, but she was going to eliminate the patent itself. She says in January, Scienton's argument has spatial appeal, this is on the patents, but ultimately fails because this theory of damages is relevant only if the patent, 457 patent and 925 application cover 2020 and SEC, and this is an issue concerning liability, an issue that should have been addressed before the close of expert discovery. So correct me if I'm misunderstanding this, but I think she's saying you have to establish that the patents include these ideas, and that's an issue that would have to be the subject of the liability determination, and you'd need substantial discovery, and it didn't take place, and so I'm excluding it. And that's in the January opinion. I recall well the January opinion, Your Honor. We did prove the nine ideas that were Scienton's nine ideas, and specifically that was proved at trial through Dr. Myers. Okay? Now with respect to the comparison to the express patent language that we believe the court should have allowed, just an objective comparison, not a patent infringement type comparison, but there was clearly with respect to those ideas, those ideas were embedded in the SEC. The jury's just going to look at the patent and look at the nine ideas and tell us that those nine ideas are covered by the patents, and that doesn't require an expert and it doesn't require an analysis of liability under the patent and what's covered under the patent. Any ordinary layperson can look at the terms of a patent and look at some list of ideas and say, covered. Really? Is that the idea that you're saying? I wouldn't say it that way at all because what we're talking about, this is not what the court sees so often in a patent infringement case. This is a lawsuit about whether nine fundamental ideas by one of the leading security experts in the world had been misappropriated, and in order to get a patent, they described to the patent office what those ideas were. That's different and that's distinct from, Your Honor, in our view, materially distinct from a claim that you would have to make a patent infringement type analysis. Were these ideas objectively stated in plain, obvious terms just as these ideas exist? And the answer to that was an unqualified yes. And I would never be here to say to this court or any court that if we were going to compare technologies in an infringement context, that we wouldn't be talking about the very thing that you just asked about. But you're saying, I guess, that the terminology in the patent explicitly matches the ideas that are held to be misappropriated. Is that it? Exactly. Exactly, okay. And that's something that a jury can tell just by looking at it because they can read it in the patent. And if we look at Exhibit 409, that's what we're going to see is a verbatim match between the ideas that are put to the jury as misappropriated and what's in the patent. And if I may just add one descriptor? Yes. Express patent terms, if I may. Yeah. Okay? So that's the comparison that we were asking. What would you be comparing the language in the patent to? To the nine Scientan ideas testified to by Dr. Myers. Testified to. Testified to at the trial. And it's in that same docket that I have referenced, the docket 409. And that is the comparison, and if I may say, comparison that we were asking to be able to make to submit to the jury on this most important element of our damage case. So that is just the circumstance, and it's a reality. We're not here to complain about the January ruling that was read or any other of these rulings, but to say, the district judge told us what was going to happen. That's fine. Our job was then to prove an unfair competition case or not, in our misappropriation of idea case. That's what she told us we were to do, and that's fine. That's what happened, and we did. And the scale of what happened here is millions, tens of millions of dollars, because the leading security expert, one of the leading experts in the world, as confirmed by the trial transcript, developed this technology. And one of the largest software companies in the world took it. And this isn't a lawyer's argument. This is a jury's determination. So when we came to this critical question of simply wanting to live by the rules that the district judge gave us, prove your tort case or not, we just wanted to, on this critical element of what the largest software company and one of the largest . . . What you're saying is that in proving your case to establish damages, you were trying to show that they patented these ideas and therefore they got a patent protection and exclusive right to use your ideas for ten years, right? That's what you're saying. That's better than I can. Okay. So I've more than exceeded my time, and thank you for the opportunity to present today. May it please the Court. My name is Michael Shisell. I'm with Arnold and Porter Case Scholar for the appellee. If I just may, I'm going to start with the patents, because I think there is some confusion here, and I want to unpack what you just heard from Appellant's counsel on this issue. An important story, I think, is what Judge Lynch mentioned, which was when they tried to inject this patent theory into the case, the case was already ten years old, and liability discovery was closed for two years. So essentially what Judge Seibert said was, you're too late, right, because it would be an impermissible burden to reopen discovery. You have to hire experts and all this stuff. You should have thought about it years ago. What if experts aren't necessary, which your adversary is saying? All you have to do is compare the documents with the Myers testimony, and that's that. I have two responses to that, Judge Walker. One is that there's lots of case law that says when you're interpreting a patent, it's appropriate for expert test. But more importantly than that, you asked a very good question. What was the jury supposed to compare the patents to? And what you heard counsel say was nine ideas. Now what he didn't tell you is that Judge Seibert ruled, I don't know if this is in the record, but it's in the transcript, his expert can't talk about nine ideas. Why? Because the so-called idea that they were trying was about a 60-page answer to an interrogatory because their client destroyed all evidence of his idea. So in response to an interrogatory saying, what is your idea, they come up with this big document with charts and everything. What their expert wanted to do was to take this big document with all these ideas, to frankly dumb it down to nine very simple concepts that the judge said, you can't refer to nine ideas. We're talking about one idea. It's plaintiff exhibit 426. It's in the record at SA388, and you don't have to look at it. And so what we're hearing now is they wanted their expert to tell the jury, and apparently it was their damages expert who was going to do this, Dr. Rao, was going to say, look, here are the nine ideas, and here are the patents, which are like this, and therefore you extend damages for ten years. So factually this argument is wrong because what should be compared is the 60-page trade secret document with the patents. And I would submit respectfully that only an expert can do that, and they were two years too late, and that's what Judge Steiber found, and that is not an abuse of discretion. I think Judge Lynch asked, why is that an abuse of discretion? I don't think that's an abuse of discretion. Let me go to the standing point again. When the judge ruled in your motion in your favor on standing, why wasn't there an opportunity to find another plaintiff or correct the situation under Rule 17A3? That's a very good question, Your Honor. In most of these cases, the, quote, real party of interest is not a party to the lawsuit. Here, from day one, 13 years ago, they had three plaintiffs. Well, the counsels changed multiple times, but they're always represented by the same counsel. And the reason that that option was not given is because plaintiff's counsel insisted before we picked a jury, after we picked a jury, at the close of evidence, that they wanted a single plaintiff and they wanted that plaintiff to be Siontime. Now, they could have said, well, let's submit all of them and see what the jury does or submit two of them and see what the jury does. They never made that argument. And two days before trial, in fact, they asked us to stipulate that there would be a single plaintiff and that it would be Siontime. And we said to them, well, show us some proof that that's the proper plaintiff and that the other entities were merged into that entity. They didn't give us anything. And, in fact, what they held back was, it's at A270, was this agreement that they, and it only came out incidentally. It turned out that they were wrong. It turned out that they were wrong. According to the district judge. Right. But at that point, there was an argument that Siontime was the proper plaintiff. They were making it based on the oral testimony that had occurred at trial. And so there was uncertainty about who was the proper plaintiff. And when that uncertainty was resolved by the district court, the district court did nothing to allow them to try and rectify the situation, if they could. They didn't ask to. Let me say, I don't understand why, as a tactical matter, they insisted on Siontime. What I can tell you, which doesn't spring necessarily from the cold reading of the transcript, is the dynamic in that courtroom. In that courtroom, there was plaintiff's table, which consisted 100% of lawyers. There was no representative of any of the three entities there. Mr. Zivick sat at counsel's table until cross-examination when we revealed that he wasn't employed by any of those parties. And then the rest of the trial, he was in the back of the room. So whatever was going on behind the scenes with those three entities, there was a tactical decision made that they were going to go with Siontime come hell or high water. And whatever consequences flow from that is a result of a lawyer's decision and his client's decision. And those consequences, at the end of the day, is they never had standing. And frankly, I don't think there was any ambiguity in that courtroom. In fact, when you read the agreement, the agreement itself doesn't mention a word about tort claims or intellectual property rights. I understand that part. But there was standing on the contract claim by Siontime. Right. But they had to have standing on the tort claims. Just because you have standing on one claim doesn't give you Article III standing on another claim, obviously. So they needed standing on both of those. But standing often is measured, and I'd have to do a little more work on this, but at the outset of the lawsuit, that's usually when we decide on whether the plaintiff has standing. Here there was no question at the outset of the lawsuit that somebody had standing on every claim between those three plaintiffs. And leave aside the one. I mean, I'm talking about the NI group and Siontime at that point. And so it seems odd to go through a whole case, and then all of a sudden you end up with the standing problem resolved and with no opportunity to correct it. And maybe there should have been, and maybe there's not much that could have been done. But, you know, I mean, it's possible that we would say, I'm not suggesting anything because obviously I don't know what my colleagues think, and I'm not sure I do either, but it's possible to send this back and say, you know, let's have a reasonable time for them to try and correct the problem. Well, Judge, a couple of responses. One is when the complaint was first filed, there were multiple other claims, including the main claims in the case that were dismissed on summary judgment. But more importantly, the group led these plaintiffs. And we had no reason, in that deposition testimony, they said one was a successor interest to the other. Fine. By the time we get to trial and the claims are whittled down to just the tort claims, and they come to us and they say, no, the contract claim was dismissed before it went to the jury. Right, right, right. Right. So there are only tort claims left. At that point, they have a choice. Let's forget about the third one. They could pick one or the other. I think it was obvious to everybody in that room who the real, who had standing on the tort claim. And it wasn't Syenton. But for whatever reasons going on behind the scenes, on that side of the V, they decided to pick Syenton. Now, let me just, just so I can be specific about the opportunities they had to fix this, which is what the trial court found. We raised this in response to their request for a stipulation. Then before jury selection, plaintiff's counsel wanted Judge Seibert to describe the three plaintiffs as related. And we said, well, I'm not sure they're related because we asked for documents and they didn't give us any documents showing that they're related. So that was another opportunity for them. And what plaintiff's counsel said is very important. This is at a 80 to 82 of the appendix. He said, we will prove Syenton standing. It is our obligation. So they were going to, and this was, this was before jury selection. So they had every intention of writing Syenton as their plaintiff all the way through verdict. Then after all of the evidence was in, including this agreement that they didn't get, that we stumbled on in cross-examining Mr. Zivick, plaintiff's counsel says, this is after all the evidence is in, before the jury gets the case, before it goes to summation, he says, we want one verdict form and have it be for Syenton. And then the district court made a finding. Judge Seibert said, informed plaintiff's counsel, you've selected a plaintiff and you may be subjected to standing, to a standing issue as a defendant argues. So even before at that point, they could have said, you know, judge, we're not going to roll the dice with Syenton. Let's submit both plaintiffs to the jury. Let's see what happens. And we'll deal with this issue post trial. Can I, is it so clear that the Syenton didn't have article three standing on the tort claim? I mean, if you think they developed, and correct me if I'm misunderstanding the record, the record's a big record, but they developed the product. They expected to profit from it. If the idea was stolen, weren't they injured and injured in a way that's fairly traceable to your clients alleged and proven conduct according to the jury? No, they had no standing. And I think this is what the district court found. And I don't think there was any dispute about this is that the idea was allegedly conveyed from NI group to CA. And then what happens is there was supposedly this verbal agreement in 2000 where they say we're transferring contracts, contracts and clients from NI group to Syenton. It's a verbal agreement. Then four years later, about a week before trial, they execute this agreement. Now the plaintiffs presumably are lawyered up. Then they know they're going to start a tort claim and they didn't bother to transfer those as well. So that is, that is what the, that's what the relevant. So I don't think they ever plaintiff. I don't think Syenton ever had article three standing. Back in the time when they, when they developed this product, they were by the testimony at trial, they're working to develop the idea with your client. They're intending to profit from it. They're partners or there's some relationship with, with NI. The idea is the idea is stolen from NI, whether or not they would have a meritorious claim can prove all the elements of a misappropriation claim. They are injured by virtue of your client's conduct. Was there Syenton then? Yes. Syenton existed. It existed. Yes. Yes. Yes. Yes. It developed the product by, I mean, shortly after the transfer of the idea at Syenton, I mean, at least there is trial testimony. Correct me if I'm wrong, but at least there is testimony in the record that it was Syenton. And both of these principles were calling themselves as employed by Syenton or this testimony to that effect. Well, you know, frankly, Your Honor, we don't know because the only thing that was ever disclosed to us really in this case is what they answered in this interrogatory answer. They never gave us source code. They never gave us a product because they say when we terminated the relationship, they destroyed their invention. It no longer exists. So to truth be told, I mean, there was testimony that they had people, Syenton had people, I think Syenton had people doing things, although we're not really sure who even Syenton is because we've never seen a representative. But they weren't injured. Some testimony that was presented at trial. Right. But for Article III standing, Syenton must own the claim. And the case law couldn't, I don't think there's any dispute about that. They must own the claim and all rights to that claim. So if they don't own the claim and, you know . . . Is there a possibility that they owned the claim? I think this is a question that's been raised. Is there a possibility that they were developing this with N.I. Group so that both of them were owning the claim? Well, there's certainly no record of that. If that happened, there's no trial record on that at all. Let me try this again because I've heard these questions and your answers and I'm still not sure I follow the answer. Is there no evidence in the record to the effect that after N.I. Group conveys this 60-page idea to Computer Associates that what is happening then is development work by Computer Associates and by plaintiffs and the people working on the plaintiff's side are Syenton people? Is that something that there is any evidence to support? First of all, the 60-pager was done in the context of litigation. Well, okay. That's what you're saying. You're saying that 60-page document is the embodiment of the idea that at the very beginning of this process, N.I. Group allegedly conveys to Computer Associates. Let me answer that in two ways. First of all, the genesis of that 60-page document is important. We spent years in this case getting them to articulate what this trade secret was or what the idea was, multiple iterations. Then they said, give us your product. So the magistrate judge said, give them the product. Then they wrote the 60-page document with our product next to them. Now, what happened after this theoretical idea was conveyed to somebody at CA? We had nothing to do with the development, nothing. There's no record that we had anything at all to do with the development. Whatever development was going on was going on with one of these three entities up in Canada. And it was never shared with us. No demos, no code, nothing. We have no idea what was going on because they destroyed it all. Supposedly on the advice of counsel, they destroyed it all. So we've never actually seen what they did, and we don't even know who did it. So at the end of the day, all these issues about standing really come back to the agreement that they're relying on, which is this thing that transfers contracts, contacts, and clients. And let me, on that- Let me try and again pin down. This 60-page document, which is what in discovery they claim was their idea. Right. At some point, that is conveyed, or some version of that idea, according to them, and according to the jury, is conveyed to Computer Associates. When did that happen, and in what format? One of these fellows from Canada comes down and has a meeting and says, Here's my idea. So on the trial record, it would have happened in like around 2000. So many years before this was. And then it would have happened, they claim it happened partly verbally and partly in some PowerPoint presentations. Now this idea, by the way, is comprised entirely of our products. It's an idea to combine our products into a single product, and the only thing that NI Group owned was some source code that knitted it together that we never got. So that was the idea. So there are some PowerPoint presentations that talk generally about, I have this idea to make this smart security system. It's going to use CA's intellectual artificial intelligence product. It's going to have the following attributes, and then there are some schematics that basically have our products and said we're going to combine these. So there are some PowerPoints that were supposedly conveyed to CA on that. So the MNDA is signed in September 2000, and that's between CA and NI Group. And that's the mutual nondisclosure agreement. Is the idea conveyed after that? No, it's actually conveyed before that. It's conveyed before that. Then Scienton, and correct me where I may be misstating the record. The evidence, I think, in the record shows that Scienton developed this ESS product from October 2000 to June 2001. Is that correct? That's what they contend. We've never seen it. But there's evidence. Is there evidence in the trial record to support that proposition? Yes. Yes. And does the trial record have evidence in it that says a more precise date in 2000 when the idea was conveyed? I'm sorry? Does the trial record reflect anything other than a more precise date or circumstance in which the idea is conveyed? I don't know if there's a precise date. So there was sort of a sales relationship person at CA, not even on the technical side, where Mr. Zivick says he generally conveyed this concept of combining our products into a single product. I think it was sometime in 2000. I can't tell you exactly. Yeah, so the conversation, my learned colleague should correct me. That conversation supposedly occurred in August of 2000, and then the MNDA was entered into in September of 2000. So actually, this was another issue in the case. He conveyed the idea before he even had an MNDA. So the answer to Judge Livingston's earlier question, I want to put words in your mouth. I'm just trying to understand it. Sure. About whether Scienton, so there's this initial concept that Scienton works on the contract, and therefore its ideas about the operationalization of the idea might have been something that was appropriated by Computer Associates. Your answer to that, if I'm not mistaken, is whatever Scienton did by way of further development of this idea was in fact never conveyed to Computer Associates and therefore couldn't have been misappropriated by Computer Associates. Is that? That's correct. And the flip side of that, Your Honor, is there are two supposedly infringing products here, CA's 2020 and STC. The unrebutted testimony at trial from the development teams for those two products was that they developed them independently. They never heard of Scienton. They never heard of NI Group. They never heard of Project Zivic. They had no idea until this lawsuit that those people even existed. That's the unrebutted testimony at trial. But the answer is yes. We didn't use any of their stuff. I mean, they had these general concepts, never made it to the design teams. I know I'm way over. The one thing I will say, Your Honor, is because the district court made a couple of factual findings that I think are significant here. One is that Mr. Zivic admitted at trial that the agreement did not transfer any tort claims or intellectual property rights. So even if you go outside the four corners of the contract, there's that factual finding by the district court, which we believe this court respectfully has to give deference because it's not clearly erroneous. The way it was stated was a little ambiguous, but you're saying that the district court . . . That's really a matter for the district court. Right, and I tried to . . . That was my question. My inartful question. The answer was no, and then is that correct? Yes, that's correct. Right, and Judge Seibert was in the room. She saw the testimony. She saw the intonation. She saw how it was articulated, and she made a finding that there was an admission that the tort claims were not conveyed, and I think that should be accorded deference. The other point I would make is that the district court also found, and this is at SPA 38, that there was no evidence that the parties ever even discussed a transfer of IP rights or tort claims, and that, too, I would respectfully suggest should be accorded deference because it's not clearly erroneous. I'm still a little puzzled about another thing, which is why this essentially factual dispute, or maybe it's not a factual dispute, this dispute about what was conveyed by the contract or the pre-written oral agreement, why that's not a question for the jury ultimately or shouldn't be a question for the jury. I understand that it has to do with standing in a certain sense. Let me give you a dumbed-down first-year torts example and see if this helps. It's not intellectual property. It's a thing. It's a snowblower. I have a snowblower. I lend it to my next-door neighbour. My next-door neighbour refuses to return it. I sue him for conversion. He says, well, yeah, I never returned it, but actually that was never your snowblower. We all know that you borrowed it in turn from the neighbour on the other side, and it's really his snowblower, and that's the argument that's made. I actually call the next-door neighbour and say, I have no interest in this snowblower. Once upon a time, I sold all my garden tools to Lynch for $100, and they put that contract into evidence. Now, essentially what is happening here is the judge then says, I'm going to rule as a matter of law that that written contract about the garden tools, the snowblower is not, as a matter of plain meaning, a garden tool, and therefore it was never conveyed to Lynch, and therefore he has no standing to bring this conversion claim, and he loses. Rather than having the jury decide that I lose on the merits of my claim about the snowblower, or maybe I win because they credit the testimony of the next-door neighbour and my testimony that we meant for this to be conveyed to me. Why is that not something that should have been put to a jury? Why does the judge get to take that issue away on the theory that it's a standing question rather than a question of whether I have made out my claim that I had intellectual property in this case, gave it to computer associates, and they took it? Yeah, I have two thoughts on that, Your Honour. One is that I think there's case law that says standing is a legal issue that's appropriately decided by the court. But more importantly, the judge did not take it away from the plaintiff. The plaintiff gave it to the judge, and the parties gave it because the parties agreed, and I don't have the transcripts, that this is an issue that the judge will decide, and she warned them. She warned them. You've actually said, I want you, judge, to rule before it goes to the jury that I am the right plaintiff. And so the plaintiff also was sort of acknowledging that this is for the judge. Yeah, and Plaintiff's Counsel was unrelenting, that they wanted scion time, scion time, scion time, scion time. Every opportunity, every juncture to maybe ask that the jury decide it came and went, and they said, we want plaintiff. Why they wanted that, I have no idea. But that is what they wanted, that's what they got, and there are consequences that flow from that. And it's their creation, not our creation, and not the court's creation, frankly. I think unless you have any questions, I will rest on our papers, and I thank you for the time. Just to add some record detail to some of the questions that were just asked of counsel, let me cite a couple pieces of the record that I think are important. Counsel was just asked when the ideas were conveyed, were the ideas conveyed before or after the nondisclosure agreement. The record at app 100 and 262 through 266 confirms specifically, before Zivic disclosed the details of the ESS idea, NI group and CA entered into the mutual nondisclosure agreement. And Mr. Zivic further testified at page 116 of the appendix that after they executed the nondisclosure agreement, he explained the details of his idea. One other question or series of questions just asked, asked about the time period following the execution of this document and whether at that time Scienton existed in the sense of the relationship. And it did. And the evidence specifically, and this is at specifically 175 through 177 of the appendix, Jovan Milinovic testified by his testimony. He said he confirmed that the companies were effectively combined while he was employed by Scienton. And that from 2000 to 2004, during which period of time, the claims at issue in the lawsuit arose. That's the evidence. Now, with respect to the trial evidence, the claim of destruction and somehow that we did something destroying evidence, that's just not right. The agreement that we had mandated, to repeat, mandated, that any work product that our company, Scienton, had had to be destroyed at the time. I don't think there was any accusation of destruction of evidence. He just said it doesn't exist in any concrete form, and that's why he has to rely on the 60-page interrogatory answer for what the idea is because there isn't anything else. I think the argument was the idea could not have been, no idea could have been misappropriated at that time because none of the information that Scienton was creating during that period it was working was ever communicated to computer associates. Fairly said. And I've made the citation that I think will be helpful to the court. Perhaps not. But in any event, one last point, if I may, on this issue of the district court. We believe the court had the discretion on this record to make the judgment that Scienton was the proper plaintiff. The only issue ever presented to the judge was standing. The judge had no real party and interest argument before it by any motion or letter motion, and here's what she said. And again, she sits there every day to make judgments. She has to make calls, and here's what she said. I am using Scienton technologies as plaintiff. If I'm reversed on appeal, then certainly that might come as a surprise. But I think that's the fairest way to proceed. Your appellants respectfully submit. Isn't that what you had asked her to do was to put Scienton as the plaintiff to the jury? We asked for one plaintiff and for her to declare as a matter of law, based on our record, that as a matter of law she could and she should declare Scienton as the party plaintiff. And she made clear that she was not doing that. That was crystal clear. She said this is still subject to challenge. These guys are raising this issue, and that's going to come up after the trial. She says that. She said it expressly in her rulings, and I believe if my memory is correct, Your Honor, she said it expressly in stating that she would review standing in the verdict form. I believe that's what the verdict form also said. If I'm misremembering, so be it. Always. And I think she was literal, and I think she was correct. She had been having had raised to her the issue of standing repeatedly, including in both 50 motions, and she made a ruling post-trial on standing. We just had counsel say to the court he admits for contract purposes there was standing. So with respect to Article III and whether or not this court can proceed and should proceed or any court in relation to our claim, this court has made clear that so long as you have standing at the outset of the lawsuit, your Article III problems are resolved. And final point, with respect to 17A, there is a curative part to it. And with respect to what happened on the standing ruling and her ruling, we thought the issue was resolved, and we were wrong. Thank you for your time. We ask that the court remand for further proceedings in connection with the court's judgment. Thank you both. Very helpful.